# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MARVIN HILL | CITY OF PHILADELPHIA and PHIIP NORDO |

**(b)** County of Residence of First Listed Plaintiff   PHILADELPHIA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   PHILADELPHIA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Joshua Van Naarden, Esq./VSCP Law
2001 Market St., Ste 3700, Phila., PA 19103/215-960-0000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983

Brief description of cause:
CIVIL RIGHTS VIOLATION

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Gerald J. Pappert

DOCKET NUMBER   19-1692; 19-2156; 19-2155; 19-1648; 21-2884;  21-1458 (Lead)

DATE   March 15, 2023

SIGNATURE OF ATTORNEY OF RECORD
*Joshua Van Naarden*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ c/o VSCP Law, 2001 Market Street, Suite 3700, Philadelphia, PA 19103 _____

Address of Defendant: _____ 1515 Arch Street, 17th Floor, Philadelphia, PA 19102 _____

Place of Accident, Incident or Transaction: _____ Philadelphia County _____

---

***RELATED CASE, IF ANY:***
19-1692; 19-2156; 19-2155; 19-1648;
Case Number: <u>21-2284; 21-1458 (Lead)</u>    Judge:   Gerald J. Pappert    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☒   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____ 3/15/23 _____    *Joshua Van Naarden* <span style="color:red">Must sign here</span>    86740

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

*A.*    *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   *(Please specify):* _____

*B.*    *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury *(Please specify):* _____
7. ☐ Products Liability
8. ☐ Products Liability – Asbestos
9. ☐ All other Diversity Cases
   *(Please specify):* _____

---

### ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Joshua Van Naarden _____, counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____ 3/15/23 _____    *Joshua Van Naarden* <span style="color:red">Sign here if applicable</span>    86740

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| **MARVIN HILL** | : | |
| | : | |
| **v.** | : | **NO. 23-** |
| | : | |
| **CITY OF PHILADELPHIA and** | : | |
| **PHILIP NORDO (Inmate #27933)** | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See §1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS**:

(a)     Habeas Corpus - Cases brought under 28 U.S.C. §2241 through §2255.           (     )

(b)     Social Security - Cases requesting review of a decision of the Secretary
of Health and Human Services denying plaintiff Social Security Benefits.     (     )

(c)     Arbitration - Cases required to be designated for arbitration under Local
Civil Rule 53.2.                                                            (     )

(d)     Asbestos - Cases involving claims for personal injury or property damage
from exposure to asbestos.                                                  (     )

(e)     Special Management - Cases that do not fall into tracks (a) through (d)
that are commonly referred to as complex and that need special or intense
management by the court.  (See reverse side of this form for a detailed
explanation of special management cases.)                                   (     )

(f)     Standard Management - Cases that do not fall into any one of the other
tracks.                                                                     (  X  )

| | | |
|---|---|---|
| 03/15/2023 | Joshua Van Naarden, Esquire | Plaintiff |
| Date | Attorney-at-Law | Attorney for |
| 215-960-0000 | 215-960-0384 | jvannaarden@vscplaw.com |
| Telephone | Fax Number | E-Mail Address |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **MARVIN HILL** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 23-** |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| 718 Arch Street, Suite 501 South | : | |
| Philadelphia, PA 19106 | : | |
| **and** | : | |
| **PHILIP NORDO (Inmate #27933)** | : | |
| North Hampton County Prison | : | |
| 666 Walnut Street | : | |
| Easton, PA 18042 | : | |
| | : | |
| **Defendants.** | : | **JURY TRIAL DEMANDED** |

---

## COMPLAINT

Plaintiff, Marvin Hill ("Plaintiff"), by and through his undersigned attorneys, VSCP LAW, states, by way of Complaint against Defendants, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this action against Philip Nordo, as well as the City of Philadelphia, pursuant to 42 U.S.C. §1983 and supplemental claims under state law to redress permanent, life-altering physical and psychological injuries suffered by Plaintiff. The negligence and deliberate indifference of these Defendants led to Plaintiff's wrongful imprisonment for murder for nearly twelve (12) years.

2.      Defendant, Philip Nordo ("Defendant Nordo"), a Philadelphia Police Detective, used his power and position to coerce and intimidate his potential victims. Defendant Nordo would groom individuals to submit to his sexually coercive advances by gaining their trust and bestowing

favors on them. Defendant Nordo used his position of authority to engage in police misconduct involving interviews of potential witnesses and suspects, including Plaintiff.

3.     Plaintiff was targeted, wrongfully prosecuted and ultimately convicted in 2013 for the murder of Stacey Linwood Sharpe, Jr. ("Sharpe") on January 7, 2010, after Plaintiff refused Defendant Nordo's, then a high-ranking Homicide Unit detective, repeated sexual advances during his purported investigation into the murder of Sharpe.

4.     On January 4, 2023, the Superior Court of Pennsylvania reversed the Post Conviction Relief Act ("PCRA") Court's order, vacated Plaintiff's judgment of sentence and remanded the case for a new trial.

5.     On January 29, 2021, an evidentiary hearing on Plaintiff's PCRA petition was held, during which Plaintiff presented a full-length Computer Aided Dispatch ("CAD") report that was more detailed than the version utilized at trial. The full-length CAD report demonstrated that the shooting of Sharpe on January 7, 2010 occurred approximately thirty (30) seconds earlier than previously determined. The full-length CAD report, when paired with the surveillance video of the corner store on January 7, 2010, clearly showed Plaintiff in front of the corner store next to Tyree Alston ("Alston") at the time of the shooting of Sharpe.

6.     On March 23, 2021, the evidentiary hearing on Plaintiff's PCRA petition reconvened, at which time Plaintiff presented additional, previously undisclosed evidence, including Plaintiff's undocumented interaction with Defendant approximately one (1) week after the killing of Sharpe.

7.     Between January 15-18, 2010, Plaintiff was detained at the Philadelphia Police Department Homicide Unit, during which time Defendant Nordo interrogated, threatened and made repeated unwanted sexual advances towards Plaintiff. Upon Plaintiff's persistent rejection of

Defendant Nordo's unwanted sexual advances, Defendant Nordo promised Plaintiff that he would "make sure [Plaintiff] never [saw] daylight again."

8.      Following Plaintiff's January 15-18, 2010 harrowing interaction with Defendant Nordo, Defendant Nordo proceeded to make good on his threat to Plaintiff in the following months by obtaining eyewitness statements from people who purportedly saw Plaintiff shoot and kill Sharpe. Witnesses that purportedly identified Plaintiff as the shooter in interviews to Defendant Nordo later recanted and/or explained making the purported identification under duress or coercion from Defendant Nordo.

9.      On June 1, 2021, the Conviction Integrity Unit of the Philadelphia District Attorney's Office ("the District Attorney's Office") filed a brief responding to Plaintiff's PCRA petition. The District Attorney's Office recommended that Plaintiff be granted a new trial, stating that "critical information scientifically proving Hill was not the shooter in the homicide of Stacey Sharpe was not provided to this Court at trial."[1]

10.     On June 13, 2022, in a subsequent brief filed by the District Attorney's Office for Plaintiff's PCRA petition, the District Attorney's Office *conceded* that "[s]urveillance video shows that [Plaintiff] was likely in front of the corner store when the shooting occurred."[2]

11.     On January 4, 2023, the Superior Court of Pennsylvania reversed, vacated conviction and remand for a new trial. The Court explicitly acknowledged that:

> "[w]e note that [Plaintiff] raises additional claims regarding misconduct by [Defendant] Nordo and the credibility of Love, who identified [Plaintiff] at trial. The Commonwealth concedes that [Plaintiff] would be entitled to relief on both issues. However, because we conclude that [Plaintiff] is

---

[1] See The District Attorney's Office's Post-Hearing Brief Recommending Petitioner Be Granted A New Trial, dated June 1, 2021, p. 2, in the matter of Comm. v. Hill, Phila. CCP Docket No.: CP-51-CR-0005356-2011.

[2] See The District Attorney's Office's Brief for Appellee, dated June 13, 2022, p. 12, in the matter of Comm v. Hill, Superior Court Pennsylvania Eastern District, No. 1535 EDA 2021.

entitled to relief on other grounds, we need not address these additional issues."[3]

12.     On January 19, 2023, after tragically having nearly twelve (12) years of his life and liberty permanently stolen from him, Plaintiff was released from prison pending his formal exoneration.

13.     On February 21, 2023, after the Conviction Integrity Unit in the Philadelphia District Attorney's Office reviewed the case and Plaintiff's claim of innocence, the District Attorney's Office requested that the Court enter a *nolle prosse* pursuant to §585(a), which was granted by the Honorable Barbara McDermott.

14.     Defendant, City of Philadelphia ("Defendant City"), had knowledge that Defendant Nordo had engaged in inappropriate and illegal conduct during criminal investigations for years **_before_** Plaintiff was subjected to his misconduct.

15.     As of 2005, Defendant City was aware of credible complaints that Defendant Nordo had engaged in consistent and pervasive misconduct with suspects and informants. Despite Defendant City's awareness of facts demonstrating this alarming and criminal pattern and practice of behavior, Defendant City failed to train, supervise or discipline Defendant Nordo. Instead, Defendant City allowed Defendant Nordo's conduct to continue unabated and, shockingly, promoted him to serve as a detective in the PPD's most prestigious investigative unit, the Homicide Division.

16.     Defendant City's failure to properly ensure that a comprehensive and credible investigation into allegations of misconduct against Defendant Nordo and imposition of appropriate discipline permitted Defendant Nordo to continue their inappropriate and illegal conduct. Defendant City's deliberate indifference to these very credible and concerning allegations emboldened

---

[3] See Memorandum of the Superior Court of Pennsylvania, dated January 4, 2023, p. 9, footnote 10, in the matter of Comm v. Hill, Superior Court Pennsylvania Eastern District, No. 1535 EDA 2021.

Defendant Nordo over the years to coerce and intimidate witnesses and suspects resulting in the arrest and conviction of innocent men, like Plaintiff. Defendant City was aware that their own investigative body to oversee police misconduct was ineffective and inadequate at addressing the abuses of power and constitutional violations perpetrated by their own police force.

17.     Plaintiff brings this action against Defendant Nordo and Defendant City, under 42 U.S.C. §1983 for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as supplemental claims under state law, seeking compensation for extraordinary harms and losses.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §1983 and 28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4) and 1367(a).

19.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(a) in that the Defendants are subject to personal jurisdiction within the Eastern District of Pennsylvania and the events that gave rise to this action occurred within the Eastern District of Pennsylvania.

20.     The matter in controversy exceeds Seventy-Five Thousand ($75,000) Dollars.

## PARTIES

21.     Plaintiff, Marvin Hill, age 20 at the time of his arrest on February 15, 2011, is and was, at all times relevant to this Complaint, a resident of Philadelphia, Pennsylvania.

22.     Defendant, City of Philadelphia, is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department ("PPD"), which, at all times relevant to this Complaint, employed Defendant Nordo.

23.     Defendant Nordo, was at all relevant times employed as a detective with the PPD. He is sued in his individual capacity.

24.     At all times relevant to this Complaint, Defendants acted under color of state law.

## OPERATIVE FACTS

25.     Paragraphs 1 through 24 are hereby incorporated by reference as if fully set forth at length herein.

26.     On January 7, 2010, at about 6:30 p.m., in response to a radio call, Officer James Bryant arrived at the 1300 block of Cumberland Street and found Mr. Sharpe lying in the street suffering from multiple gunshot wounds. Sharpe was transported to Temple University Hospital where he died at 10:24 p.m., just several hours later.

27.     On January 7, 2010, at 9:40 p.m., just several hours after the shooting of Sharpe, Katerina Love ("Ms. Love") was interviewed by Central Detective Division Detective Domenic and Detective Waring regarding the shooting of Sharpe.

(a)     Ms. Love stated that she witnessed the shooting occur while sitting in a chair in her bedroom window. She witnessed two guys walking down the street, and "the guy on the pavement" pulled out a gun and started shooting at "the guy in the street." Ms. Love heard three to four shots.

(b)     Ms. Love states that she recognized the shooter as someone she sees almost every day by the store on 12th and Cumberland but does not know the shooter by name. She confirmed that she would know if she saw him again.

(c)     Ms. Love described the shooter as wearing, *inter alia*, black jacket with a red Polo horse on it, and a black hat with a red Polo horse.

28.     On January 7, 2010, during her first statement, Ms. Love did not identify Plaintiff as the individual she witnessed shooting Sharpe.

29.     On January 8, 2010, at 2:00 p.m., Ms. Love was interviewed by Detectives Judge and Kane at the Homicide Unit regarding the killing of Sharpe. This interview represents Ms. Love's second statement provided about the incident.

(a)     Consistent with her first statement, Ms. Love describes the shooter as wearing a ***black Polo Ralph Lauren jacket with a small red horse*** on the front, and ***a black Polo Ralph Lauren hat with a red horse*** on the front of it.

(b)     Consistent with her first statement, Ms. Love states that she recognized the shooter and that she saw him prior to the incident on the same day. When Ms. Love saw the shooter prior to the incident on the day in question, he was wearing the same clothes as when she witnessed the shooting.

30.     On January 8, 2010, during her second statement, Ms. Love did not identify Plaintiff as the individual she witnessed shooting Sharpe.

31.     On January 8, 2010, Detective Thorsten Lucke recovered surveillance video from a store located on the 2500 block of Sartain Street, a little over one (1) block from the shooting. The video recorded the interior of the store, focusing on the entryway door, on January 7, 2010.

32.     On January 7, 2010, the surveillance video showed Plaintiff repeatedly entering and exiting the store for about an hour prior to the time of the shooting.

33.     On January 29, 2021, eleven (11) years later, an evidentiary hearing on Plaintiff's PCRA petition was held, during which Plaintiff presented a full-length CAD report that was more detailed than the version utilized at trial. The full-length CAD report demonstrated that the shooting of Sharpe on January 7, 2020 occurred approximately thirty (30) seconds earlier than previously determined. The full-length CAD report, when paired with the surveillance video of the corner store on January 7, 2010, clearly showed Plaintiff in front of the corner store next to Tyree Alston at the time of the shooting of Sharpe. Notably, Alston is seen pointing in the direction of the shooting at the time the shooting occurred, while standing next to Plaintiff.

34.     On January 29, 2021, during the evidentiary hearing related to Plaintiff's PCRA petition, it was determined that the surveillance video from January 7, 2010, when paired with the full-length CAD report, demonstrated that the shooting of Sharpe on January 7, 2010, occurred at a time when Plaintiff was standing in full view of the captured surveillance video, proving him as not being the shooter.

**DEFENDANT NORDO'S TARGETING OF PLAINTIFF**

35.     Approximate one week following Sharpe's death, Plaintiff became a victim of Defendant Nordo's misconduct, including sexual assault, threats and intimidation.

36.     On January 15, 2010, at approximately 7:00 p.m., Plaintiff was stopped at Sartain Street and Cumberland Street by two (2) undercover officers. Plaintiff was told by the undercover officers that he had a warrant for his arrest, and subsequently arrested and transported to the Police Administration Building ("PAB") for "Detective Judge."

37.     On January 15, 2010, once Plaintiff arrived at the PAB, he was placed in an interrogation room and told that officers would be attending to him soon. Plaintiff was left isolated in the interrogation room for hours. It would be the following morning, during sunrise, before anyone came to question Plaintiff.

38.     On January 16, 2010, during sunrise, Detective Judge entered the interrogation room Plaintiff was left in with another unidentified detective.

39.     On January 16, 2010, upon entering the interrogation room, Detective Judge questioned Plaintiff about the killing of Sharpe. After Plaintiff repeatedly told Detective Judge that he did not know anyone by the name "Stacey Sharpe" or recognize Sharpe's photo, and Detective Judge telling Plaintiff he did not believe him, Detective Judge stormed out of the interrogation

room. When Detective Judge left, Plaintiff placed his head down on the interrogation room table, began to cry, and eventually fell asleep.

40.     On January 16, 2010, after Detective Judge left the interrogation room, Plaintiff woke up and noticed an unfamiliar detective in the room. The detective introduced himself as Detective Phillip Nordo ("Defendant Nordo").

41.     On January 16, 2010, relieved that the entering Detective was not Detective Judge, Plaintiff asked Defendant Nordo if he could use the restroom. Defendant Nordo escorted Plaintiff to the restroom. As Plaintiff walked to the restroom, he noticed that the sun was setting outside and it was beginning to become dark outside.

42.     On January 16, 2010, Plaintiff began using the urinal while Defendant Nordo waited in the restroom with him. As Plaintiff was using the urinal, Defendant Nordo looked at Plaintiff and told him that he can "make this all disappear" and that "[Plaintiff] just has to be honest with him." Defendant Nordo further reassured Plaintiff by telling him that "he will figure it all out."

43.     On January 16, 2010, while speaking with Defendant Nordo in the restroom, Plaintiff became teary-eyed and told Defendant Nordo that "he had to help [Plaintiff] out of this because [Plaintiff] really didn't know who did this nor did [Plaintiff] know the person that was killed." Again, Defendant Nordo reassured Plaintiff by wrapping his arm around Plaintiff and stating that he "just had to trust him."

44.     On January 16, 2010, shortly after leaving the restroom, Plaintiff and Defendant Nordo re-entered the interrogation room, where Defendant Nordo continued to tell Plaintiff to relax and to trust him. Defendant Nordo also provided Plaintiff with chips and juice, and suggested that he and Plaintiff move from the interrogation room get more comfortable.

45.    On January 16, 2010, Defendant Nordo relocated Plaintiff to an "office like cubicle" setting in the PAB, where Plaintiff was instructed to sit towards the back of the room while Defendant Nordo sat across from Plaintiff at a computer.

46.    On January 16, 2010, shortly after relocating to the cubicle-like space with Defendant Nordo, Plaintiff asked him what time it was and when he would be able to leave. Defendant Nordo responded, saying it was "almost 11:00 p.m.," and told Plaintiff he would be leaving soon.

47.    On January 16, 2010, at approximately 11:00 p.m., Defendant Nordo asked Plaintiff if he ever watched gay porn. Plaintiff responded "no," and asked Defendant Nordo if he was gay.

48.    On January 16, 2010, shortly after 11:00 p.m., Defendant Nordo told Plaintiff that he could help Plaintiff, but that ***he could also make Plaintiff's life "a living hell if [Plaintiff] didn't take him serious.***"

49.    On January 16, 2010, shortly after 11:00 p.m., and heading into the following day, Plaintiff asked Defendant Nordo how Defendant Nordo could help him out, to which Defendant Nordo stood up, placed his jacket on the back of Plaintiff's chair, and began to massage Plaintiff's shoulders. Defendant Nordo reassured Plaintiff that he could make this all go away "if we take care of each other."

50.    On January 16, 2010, shortly after 11:00 p.m., and heading into the following day, Defendant Nordo began talking softly to Plaintiff while massaging his shoulders, telling him how "tense up [Plaintiff] was," how "[Defendant Nordo] was happy [Plaintiff] was finally relaxing," and how "[Defendant Nordo] can make sure this all goes away if [Defendant Nordo and Plaintiff] take care of each other." Plaintiff asked Defendant Nordo how he could help if he didn't know any information, to which Defendant Nordo leaned down and whispered into Plaintiff's ear while "I

know how." As Defendant Nordo whispered into Plaintiff's ear, Defendant Nordo placed his hands

on Plaintiff's chest, and placed his lips onto Plaintiff's neck. Plaintiff stood up and told Defendant

Nordo that he did not "go that way."

51.     On January 16, 2010, following Plaintiff's rejection of Defendant Nordo's sexual

advance, Defendant Nordo sat down with a grin on his face and instructed Plaintiff to sit down as

well. Defendant Nordo told Plaintiff that he "thought [Plaintiff] trusted him" and that he "really

wanted to help [Plaintiff] out." Next, Defendant Nordo moved his chair closer to Plaintiff's chair,

positioning Plaintiff's knees between Defendant Nordo's legs, and kept telling Plaintiff "if

[Plaintiff] wants his help, [Plaintiff] had to do a favor for a favor." As Defendant Nordo made

these statements to Plaintiff, Defendant Nordo was rubbing Plaintiff's thighs, moving his hands

closer to Plaintiff's penis. Plaintiff pushed Defendant Nordo's hands off Plaintiff's thighs, and

again told Defendant Nordo that he did not "go that way."

52.     On January 17, 2010, ***after Plaintiff rejected Defendant Nordo's numerous sexual***

***advances, Defendant Nordo's face became flush red and told Plaintiff that he would "make sure***

***Plaintiff never [sees] daylight again."*** At approximately 12:00 a.m., Defendant Nordo grabbed

Plaintiff forcefully and pushed Plaintiff back into the interrogation room. When Plaintiff asked

when he could leave, Defendant Nordo responded "never" and slammed the interrogation room

door shut. Plaintiff remained in the interrogation room for over twenty-four (24) additional hours

following Defendant Nordo's numerous sexual advances.

53.     On January 18, 2010, in the afternoon, Plaintiff was released from police custody,

ending his three (3) day nightmare at the Homicide Unit.

**DEFENDANT NORDO MAKES GOOD ON HIS THREATS TO PLAINTIFF**

54.     On April 28, 2010, Defendant Nordo, Detective of the Homicide Unit, was directed to locate Plaintiff, Plaintiff's bother, Michael Hill, and Alston, all who had been identified from the surveillance video as potential witnesses to the shooting. Shortly thereafter that same day, Defendant Nordo located Plaintiff and Michael Hill on the 2500 block of Sartain Street in Philadelphia.

55.     On April 28, 2010, Defendant Nordo transported Plaintiff to the PAB in an unmarked minivan, while Michael Hill was transported in a separate vehicle.

56.     On April 28, 2010, Plaintiff was picked up by Defendant Nordo and held at the PAB for nearly twenty-four (24) hours before he was formally interrogated by Defendant Nordo on April 29, 2010.

57.     On April 28, 2010, at approximately 5:30 p.m., Defendant Nordo arrived at the PAB with Plaintiff. Upon information and belief, Michael Hill's separate transport vehicle arrived at the PAB shortly thereafter.

58.     On April 28, 2010, pursuant to the assigned detective's instructions, Defendant Nordo escorted Plaintiff through the rear entrance of the building, the Police Detention Unit ("PDU"). Plaintiff was patted down and taken to the Homicide Unit, where he was seated on a bench and told to wait.

59.     On April 28, 2010, at 8:30 p.m., Michael Hill was interviewed by Defendant Nordo and Detective Lucke at the Homicide Unit regarding the killing of Sharpe.

>    (a)     Michael Hill stated that on January 7, 2010 he was at the store on Sartain and Cumberland Street with, among others, Plaintiff and Alston. A young boy (later determined to be Sharpe) walks by the store, and Alston said he has to "step off" and will be right back. Michael Hill then saw Alston following Sharpe down the street. Michael Hill then sees Alston pull out a gun and begin chasing Sharpe while shooting at him. Following the

shooting, Sharpe kept running up the street towards the beer distributor near Broad Street.

(b)     Michael Hill stated that Alston began chasing after Sharpe because Sharpe owed Alston money, and Alston wanted Sharpe's phone. After the shooting, Michael Hill received a phone call from Plaintiff stating that Alston just shot "that young boy," to which Michael Hill told Plaintiff that he already knew.

(c)     Michael Hill identifies Alston in a photo from the day of the shooting as having on a skully, and "white stripes on the arms of his jacket." Michael Hill also identifies Plaintiff as wearing a Black Polo jacket and a Black Polo hat with a brown Polo symbol.

60.     On April 28, 2010, at approximately 5:00 p.m., upon conclusion of the interview of Michael Hill on, which ended well past his shift, Defendant Nordo left the PAB.

61.     On April 29, 2010, at 1:55 p.m., nearly twenty-four (24) hours after completing Michael Hill's interview, Defendant Nordo arrived back at the Homicide Unit and began taking Plaintiff's statement regarding the killing of Sharpe.

(a)     Plaintiff stated that on January 7, 2010, he was on the corner of Sartain Street and Cumberland Street with his brother, Michael Hill, and Alston. Alston mentioned to Plaintiff that he wanted to leave because the area was "hot with cops" so he and Alston began walking towards 12th Street. While walking, Alston stopped in an alleyway to get his 9mm and said he has to "handle something."

(b)     Next, Plaintiff states that he and Alston saw Sharpe, and Alston ran across the street after him, pulled his gun out and started shooting at him. When Plaintiff saw Alston shooting at Sharpe, Plaintiff walked towards his home because he "wanted nothing to do with that shit." Plaintiff called his brother Michael and told him what Alston had done, to which Michael told Plaintiff he knew.

(c)     Plaintiff stated that he believed Alston shot Sharpe because Sharpe owed Alston some money, and Alston wanted Sharpe's cell phone.

(d)     Plaintiff was asked by detectives why this statement is different than ***the original statement Plaintiff provided to detectives***. Plaintiff responded that he was scared and didn't want to get himself involved in this.

62.     On May 11, 2010, at 6:10 p.m., Ms. Love was interviewed by Defendant Nordo regarding the killing of Sharpe. According to the Investigation Interview Record, Defendant Nordo's interview of Ms. Love took place at "Broad & Cumberland Streets." This interview represents Ms. Love's third statement provided about the incident.

    (a)     Ms. Love confirms that she was previously interviewed by police about the shooting on the night that it happened and that she is able to identify the shooter of Sharpe she originally described in her prior interview.

    (b)     Upon being presented with a photo array, Ms. Love purportedly identified Plaintiff as the individual she witnessed shooting on January 7, 2010.

    (c)     Upon being asked if Plaintiff was the person wearing the "black polo hat and was shooting a guy," Ms. Love purportedly confirmed it was Plaintiff.

63.     Ms. Love's May 11, 2010 purported identification of Plaintiff, ***to Defendant Nordo***, as Sharpe's shooter is the first time Plaintiff is inculpated in the killing.

64.     On October 8, 2020, ten (10) years later following a crime scene visit by Plaintiff's counsel, the District Attorney's Office, and the PCRA court during Plaintiff's petition process, it was determined that it was not possible for Ms. Love to have seen the face or insignia on the front of the shooter's clothing from her bedroom window (as mentioned in prior statements), as the shooter was facing away from Ms. Love when he was shooting and running after the shooting.

65.     On May 27, 2010, at 10:00 a.m., Alston's statement was obtained at the Police Homicide Unit after being interrogated by Defendant Nordo.

    (a)     Alston stated that on January 7, 2010, himself, Plaintiff, and Michael Hill were hanging around the store on Sartain and Cumberland Streets. Briefly before the shooting, Plaintiff looked up Cumberland Street towards Broad Street, mentioned somebody owed him some money for a "pack" of crack cocaine he had given him, and began walking up Cumberland Street (towards Broad Street) while on his cell phone.

    (b)     Next, Alston stated that he then saw Plaintiff in the middle of the street between 12th and 13th and Cumberland Street, "jumping back shooting a gun at the boy."

14

(c)     Plaintiff walked back towards the store, where Alston was, and a couple seconds later he and Plaintiff walked to Plaintiff's home and into the basement. When asked by Alston why he did it, Plaintiff responded, "if I let him get away with keeping my package than anyone else would do it." Plaintiff then called his brother Michael Hill on his cell phone, who presented at the house not too long after.

(d)     Alston stated that on the day of the shooting, Plaintiff wore a black leather jacket, black skully and boots with fur in them. Alston described Michael Hill as wearing a black hoody jacket, and stated that he wore a blue sweat jacket and sweat pants himself.

66.     On May 27, 2010, an affidavit of probable cause to arrest Plaintiff and charge him with murder for the shooting death of Sharpe was prepared. The only evidence supporting the affidavit of probable cause for Plaintiff's arrest was Ms. Love and Alston's statements provided to Defendant Nordo purportedly inculpating Plaintiff.  An arrest warrant was issued for Plaintiff.

67.     On May 28, 2010, at 8:25 a.m., Michael Hill was interviewed by Defendant Nordo regarding the killing of Sharpe. This interview represents Michael Hill's second statement to police at the Homicide Unit regarding the killing of Sharpe.

(a)     Michael Hill stated that the information he provided to Defendant Nordo and Detective Lucke on April 28, 2010 was *not correct*. Specifically, Michael Hill states that he did not tell the truth in his prior statement because he did not want his brother [Plaintiff] to be "in it."

(b)     Again, Michael Hill states that he was in the store with, among others, Plaintiff and Alston, when a guy walked past the store. However, this time, Michael Hill purportedly states that Alston *and* Plaintiff walked off together.

(c)     Next, Michael Hill saw the guy who had just walked past the store (now known to be Sharpe) running. Shortly thereafter, Michael Hill heard about three (3) gunshots. Next, Michael Hill got a phone call from Plaintiff who asked Michael Hill if he heard gunshots. Michael Hill told him yes, he did.

(d)     The following day, on January 8, 2010, Plaintiff purportedly told Michael Hill that he and Alston shot someone the day prior (January 7, 2010).

15

68.     On February 15, 2011, Plaintiff was arrested, detained and confined in prison for murder charges in connection with the shooting death of Sharpe on January 7, 2010. Defendant Nordo testified at Plaintiff's criminal trial.

69.     On July 21, 2011, Alston wrote a letter to Plaintiff apologizing for signing the false statement. In his letter to Plaintiff, Alston maintained that he and Plaintiff were on the surveillance video in front of the store when the shooting occurred.

70.     On January 22, 2013, Plaintiff's trial for murder in connection with the January 7, 2010 shooting death of Sharpe commenced. The following witnesses testified:

**Philip Nordo**

   a.     On January 22, 2013, during his testimony, Defendant Nordo was presented with his reference to a prior statement during his April 29, 2010 interview of Plaintiff. Defendant Nordo testified that he did not know the whereabouts of Plaintiff's statement made prior to April 29, 2010.

**Ms. Love**

   b.     On January 22, 2013, Ms. Love did not identify Plaintiff as the individual she witnessed shooting on January 7, 2010. Additionally, when presented with her ***May 11, 2010 interview with Defendant Nordo*** in which she purportedly identified Plaintiff, she testified that she ***signed the photo array with Plaintiff's photograph under duress.***

**Alston**

   c.     On January 25, 2013, Alston testified that he was detained by homicide detectives for eighteen (18) hours before being interviewed on May 27, 2010. Alston denied making his May 27, 2010 statement and testified that he was forced to sign it by detectives. Alston further testified that detectives threatened to charge him with the crime if he did not sign the statement inculpating Plaintiff and told Alston that Michael Hill and Plaintiff had already signed statements inculpating Alston of shooting Sharpe. ***Alston testified that one of the detectives that interviewed him told him that they knew he, nor Plaintiff, killed Sharpe but that "someone had to go down for it."*** Alston testified that he gave in to the pressure from the detectives.

**Michael Hill**

   d.     On January 28, 2013, Michael Hill testified that ***the signatures on the statements provided to detectives, one of which was Defendant Nordo, was not his signature.*** He further testified that the information contained in the statements was not what he said.

71.     At Plaintiff's January 22-28, 2013 trial, every witness that inculpated Plaintiff recanted and identified coercive and/or unconstitutional tactics that led to their false identification of Plaintiff.

72.     On October 8, 2020, Plaintiff's counsel, the District Attorney's Office, and the PCRA court conducted a visit to the crime scene where Sharpe was murdered. Following the crime scene visit during Plaintiff's petition process, it was determined that it was likely not possible for Ms. Love to have seen the face or insignia on the front of the shooter's clothing from her bedroom window (as mentioned in prior statements), as the shooter was facing away from Ms. Love when he was shooting and running after the shooting.

73.     On January 29, 2021, it was determined, ten (10) years later, that the recovered surveillance video revealed that Michael Hill left the corner store almost thirty (30) minutes before the shooting and did not return until about ten (10) minutes after the shooting. ***Michael Hill, Plaintiff's brother, was not present at the corner store during the time of the shooting***.

74.     On January 29, 2021, during an evidentiary hearing held in regard to Plaintiff's PCRA petition, Plaintiff presented a full-length CAD report that was more detailed than the version utilized by Plaintiff's trial counsel. The newly discovered full-length CAD report demonstrated that the shooting of Sharpe on January 7, 2020 occurred approximately thirty (30) seconds earlier than previously determined, which was based upon the CAD report available at Plaintiff's trial in 2013.

   a.     The full-length CAD report shown at the evidentiary hearing, when paired with the surveillance video of the corner store on January 7, 2010, clearly showed Plaintiff in front of the corner store next to Alston at the time of the shooting of Sharpe. Notably, Alston is seen pointing in the direction of the shooting at the time the shooting occurred, while standing next to Plaintiff.

75.     On June 6, 2021, the District Attorney's Office of Philadelphia filed a brief in regard to Plaintiff's PCRA petition recommending that Plaintiff be granted a new trial, stating that

17

"critical information scientifically proving Hill was not the shooter in the homicide of Stacey Sharpe was not provided to this Court at trial." Additionally, in a subsequent brief filed by the District Attorney's Office on June 13, 2022 for Plaintiff's PCRA petition, the District Attorney's Office *conceded* that "[s]urveillance video shows that [Plaintiff] was likely in front of the corner store when the shooting occurred."

76.     On January 4, 2023, the Superior Court of Pennsylvania's issued a Decision to reverse Plaintiff's judgment of sentence and remand for a new trial due to Plaintiff's ineffective assistance of counsel at his 2013 trial. In the Court's memorandum, the Court explicitly acknowledged that "[w]e note that [Plaintiff] raises additional claims regarding misconduct by [Defendant] Nordo and the credibility of Love, who identified [Plaintiff] at trial. The District Attorney's Office concedes that [Plaintiff] would be entitled to relief on both issues. However, because we conclude that [Plaintiff] is entitled to relief on other grounds, we need not address these additional issues."

77.     Finally, on January 19, 2023, after tragically having nearly twelve (12) years of his life and liberty permanently stolen from him, Plaintiff was released from prison pending his formal exoneration.

78.     On February 21, 2023, after the Conviction Integrity Unit in the Philadelphia District Attorney's Office reviewed the case and Plaintiff's claim of innocence, the District Attorney's Office requested that the Court enter a *nolle prosse* pursuant to §585(a), which was granted by the Honorable Barbara McDermott.

## CITY KNEW ABOUT DEFENDANT NORDO

79.     At least as early as 2005, Defendant City was aware of credible complaints that Defendant Nordo, in his role as a Philadelphia police detective, groomed suspects for future sexual

relationships. In grooming these suspects, Defendant Nordo promised leniency or reward money, used threats and coercion, and engaged in sexual assault. Defendant Nordo used his position to cause witnesses to sign false or inaccurate interview statements and confessions. Despite its awareness of these credible complaints, Defendant City failed to supervise, discipline or train Defendant Nordo.

80.     Despite numerous credible complaints lodged against Defendant Nordo to the PPD, and then forwarded to the District Attorney's Office, Defendant Nordo was neither charged nor disciplined.

81.     Despite these complaints, in 2009, Defendant City promoted Defendant Nordo to the Homicide Unit. In that assignment, Defendant Nordo continued to engage in coercive grooming and assaultive behavior, including fabricating evidence and coercing fabricated statements from witnesses and suspects.

82.     As a homicide detective, Defendant Nordo was given access and opportunity, as well as wide latitude, to conduct homicide investigations. Defendant Nordo was then able to continue his misconduct for years, unfettered, as Defendant City failed to institute any oversight or supervision over his conduct. Defendant Nordo's conduct, facilitated by Defendant City's deliberate indifference, led to the wrongful conviction and imprisonment of several men, including Plaintiff.

83.     In 2017, Defendant Nordo was fired by the PPD, amid allegations that Defendant Nordo had been engaging in police misconduct with potential witnesses and suspects for many years. In February 2019, Defendant Nordo was indicted by a Grand Jury on multiple counts of rape, involuntary deviate sexual intercourse, sexual assault, misconduct, intimidation, and theft of city funds.

84.     After the Grand Jury indictment, the PPD acknowledged that Defendant Nordo's criminal behavior was as a result of a lack of oversight and proper supervision.

**THE PPD'S PATTERN AND PRACTICE OF UNCONSTITUTIONAL MISCONDUCT IN HOMICIDE INVESTIGATIONS, INCLUDING THE FABRICATION OF EVIDENCE, COERCION AND SUGGESTION OF FALSE STATEMENTS FROM WITNESSES AND SUSPECTS, AND SUPPRESSION OF EXCULPATORY EVIDENCE**

85.     The PPD has exhibited a pervasive pattern and practice of unconstitutional misconduct in their homicide investigations, including coercion of false statements from witnesses and suppression of exculpatory and inconsistent evidence, that dates back to at least the early 1970's and has continued beyond the Defendants' investigation and prosecution of Marvin Hill.

86.     For many years, dating back at least to the 1970's, and continuing well beyond the time of the investigation of Mr. Sharpe's murder, Defendant City of Philadelphia had, in force and effect, a policy, practice or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain statements, fabricating inculpatory evidence and withholding exculpatory evidence.

87.     At the time of the investigation and prosecution of Marvin Hill, the PPD had a policy, practice or custom involving the use of various techniques to coerce false statements, including, but not limited to, subjecting witnesses to needlessly prolonged interrogations and interviews, failing to record interviews/interrogations, isolation, making promises, regardless of their truthfulness, threatening charges for unrelated misconduct, offering assistance in unrelated criminal matters, interviewing witnesses while they are under the influence of drugs that make them more susceptible to coercion, and assertions that the witness will benefit from making a statement that assists the police or suffer some sort of disadvantage if they refuse.

88.     At the time of the investigation and prosecution of Marvin Hill, the PPD had a policy, practice or custom involving the use of various techniques to suppress and/or withhold

exculpatory or inconsistent statements and evidence, in violation of their known duty under <u>Brady</u>, including, but not limited to, making false statements to prosecutors about the existence of evidence, failing to provide complete Homicide files to prosecutors, coercing witnesses into keeping exculpatory and inconsistent information from prosecutors, disregarding or deleting exculpatory and inconsistent information from Homicide files, ignoring exculpatory and inconsistent information so that there is no record to be deleted from Homicide files, threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying and deleting information of key exculpatory witnesses so that they do not testify at trial.

89.     This policy, practice or custom involved the use of various techniques to coerce inculpatory statements, including, without limitation, isolation, separating juvenile or otherwise vulnerable suspects or witnesses from their friends and family, subjecting individuals to needlessly prolonged interrogations, making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement, the use or threat of physical violence, authoritative assertions of a suspect's guilt, including, without limitation, confrontation with false inculpatory evidence, and providing false assurances that the suspect will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

90.     This policy, practice or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation, providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication, taking misleading steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation, selectively documenting a witness or suspect's eventual statement and not the preceding

interrogation, preparation and rehearsal, and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words.

91.     These practices were well known to Defendant, City of Philadelphia, and its policymakers, with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977-1978, governmental investigations, complaints from lawyers and civilians, and internal police investigations, including the PPD's 39th District Corruption Scandal in the 1990's, complaints lodged by the public, prior litigation and internal police investigations.

92.     The 39th District Corruption Scandal involved widespread unconstitutional practices that were not appropriately addressed or remediated despite pervasive knowledge throughout the PPD and Defendant, City of Philadelphia.  The police misconduct in the 39th District Corruption Scandal included constitutional violations that mirror those violations suffered by Marvin Hill, including omission of material information and suppression of exculpatory evidence and coercive interrogation tactics, and false allegations of criminal conduct.  The PPD was deliberately indifferent to the officer's misconduct and credible complaints to their internal compliance department were disregarded.

93.     Various cases demonstrate that this misconduct was pervasive within the PPD at time of the investigation into Mr. Sharpe's murder and the subsequent prosecution of Marvin Hill. This misconduct was pervasive within the PPD's Homicide Unit before and after its investigation of Marvin Hill and, upon information and belief, the misconduct described in this Complaint was expressly or tacitly committed or deliberately ignored when committed in the presence of the Homicide Unit and the PPD supervisors or because of their deliberate indifference to this misconduct.

94.     Numerous other convictions that later resulted in exonerations demonstrate the pervasive patterns, practices and customs of official misconduct within the Homicide Unit of the PPD include:

(a)     **Raymond Carter**
(b)     **Anthony Wright**
(c)     **Eugene Gilyard** and **Lance Felder**
(d)     **Carlos Hernandez** and **Ed Williams**
(e)     **Jackie Combs, Jr.**
(f)     **Willie Veasy**
(g)     **Percy St. George**
(h)     **Jimmy Dennis**
(i)     **Donald Ray Adams**
(j)     **Andrew Swainson**
(k)     **Walter Ogrod**
(l)     **James Dennis**
(m)     **Shaurn Thomas**
(n)     **Donald Outlaw**
(o)     **Willie Stokes**
(p)     **Terrance Lewis**

95.     As a result of a pattern of police misconduct that was in effect at the time of the investigation of the murder of Mr. Sharpe for which Marvin Hill was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of NAACP v. City of Philadelphia requiring widespread reforms in the PPD, while also limiting certain aspects of their investigative practices and policies.

96.     This practice, as exemplified by the investigation into Marvin Hill's malicious prosecution, and those wrongful convictions detailed hereinabove, continued for years due to the deliberate indifference of the PPD and Defendant, City of Philadelphia, to these policies, practices and customs.

97.     During the 1980's and early 1990's, and concurrent with the time of the investigation and prosecution of Marvin Hill by the PPD, there was, within the PPD a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including

systemic violations of the Fourth and Fourteenth Amendments.  On three (3) separate occasions in

the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from

engaging in these practices:

(a)    **Cliett v. City of Philadelphia:**  Consent decree arising out of "Operation Cold Turkey", that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices);

(b)    **Spring Garden Neighbors v. City of Philadelphia:**  Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation);

(c)    **Arrington v. City of Philadelphia:** Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

98.    At the time of the investigation and prosecution of Marvin Hill, the PPD had a

practice, policy and custom of:

(a)    Engaging in unlawful interrogation of suspects, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, and failing to disclose exculpatory evidence;

(b)    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

(c)    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

(d)    Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and Defendants, including unlawful police interrogations, searches, arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;

(e)    Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD police, including the Defendant officer in this case, to violate the rights of citizens, such as Marvin Hill.

99.    At the time of the investigation and prosecution of Marvin Hill, and for many years

before and thereafter, the PPD and Defendant, City of Philadelphia, has been deliberately

indifferent to the need to train, supervise and discipline police officers.  The Internal Affairs

Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes

meaningful disciplinary and remedial actions in the following respects:

(a)    excessive and chronic delays in resolving disciplinary complaints;

(b)    a lack of consistent, rational and meaningful disciplinary and remedial actions;

(c)    a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

(d)    the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

(e)    the PPD discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;

(f)    the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

(g)    a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

(h)    serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

(i)    lack of an effective early warning system to identify, track and monitor "problem" officers;

(j)    IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

(k)    IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

<u>**COUNT I: 42 U.S.C. §1983**</u>
<u>**Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**</u>

100.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

101.     Defendant Nordo, acting individually with malice and knowing that probable cause did not exist to prosecute Marvin Hill for Mr. Sharpe's murder, intentionally caused Marvin Hill to be arrested, charged and prosecuted for those crimes, thereby violating Marvin Hill's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

102.     Defendant Nordo, acting individually, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in the arrest and prosecution of Marvin Hill without probable cause.

103.     Defendant Nordo performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Marvin Hill's clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

104.     The prosecution finally terminated in Marvin Hill's favor on February 21, 2023, after his charges were dismissed.

105.     The acts and omissions by Defendant Nordo, as described in the preceding paragraphs, were the direct and proximate cause of Marvin Hill's injuries because Defendant Nordo knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Marvin Hill.

**COUNT II: 42 U.S.C. §1983**
**Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by**
**Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence**

106.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

107.     Defendant Nordo, acting individually and within the scope of his employment with the PPD, deprived Marvin Hill of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including, without limitation, the coerced identification from Ms. Love and the false statements from Alston.

108.     Defendant Nordo deprived Marvin Hill of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including, without limitation, information regarding the true circumstances of Mr. Sharpe's murder, including Michael Hill, Alston and Ms. Love's interrogations and their actual statements, prior to Defendant Nordo's coercion and fabrication of their false statements - that these witnesses had no information implicating Marvin Hill.

109.     Defendant Nordo deprived Marvin Hill of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including, without limitation, by failing to pursue information from various witnesses, which would have led to the true killer.

110.     Defendant Nordo performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Marvin Hill's clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

111.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Marvin Hill's injuries.  Defendants knew, or should have known, that their conduct would result in Marvin Hill's wrongful arrest and prosecution and incarceration.

112.    On  January 19, 2023, Plaintiff was finally released from prison.  By that time, Plaintiff had been imprisoned for nearly twelve (12) years.

113.    As a direct and proximate result of Defendant's actions, Plaintiff was wrongly prosecuted, detained and incarcerated for nearly twelve (12) years and sustained other injuries and damages as set for above.

## COUNT III: 42 U.S.C. §1983
## Municipal Liability Claim

114.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

115.    Defendant, City of Philadelphia, by and through its final policymakers, had in force and effect during time of Marvin Hill's wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice or custom of unconstitutional misconduct in homicide and other criminal investigations, including, in particular, the use of coercive techniques in interviews and interrogations to obtain confessions, the fabrication of inculpatory evidence, the fabrication of incriminating statements from witnesses, suspects and arrestees by coercion, suggestion, and feeding details about the crime, and the withholding of exculpatory evidence.

116.    Final policymakers for Defendant, City of Philadelphia, had actual or constructive notice of these practices, policies and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions, withholding exculpatory evidence, fabricating inculpatory evidence, and, particularly, fabricating incriminating statements from witnesses, suspects and arrestees by coercion, suggestion and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

117.    Such unconstitutional municipal customs, practices and/or policies were the moving force behind the false, coerced and fabricated statements used against Marvin Hill, causing his arrest, prosecution, and nearly twelve (12) years of incarceration, as well as all the other injuries and damages set forth hereinabove.

118.    Defendant City caused the violation of Plaintiff's constitutional rights.  As evidenced by the lengthy history of misconduct involving PPD officers' investigative practices

in general, and credible reports of Defendant Nordo's misconduct in particular, Defendant City, with deliberate indifference, employed a custom, pattern, practice or policy of allowing officers to use their position to cause witnesses to sign false or inaccurate interview statements and/or failed to train, supervise and/or discipline officers who engaged in such conduct.  The misuse of their position when interviewing witnesses to which Defendant City was deliberately indifferent included officers:

    (a)    Coercing false statements from witnesses;

    (b)    Making false statements or reports regarding the information provided by a coerced witness;

    (c)    Coercing or threatening witnesses to provide information;

    (d)    Fabricating evidence against witnesses/suspects; and/or

    (e)    Sexually assaulting witnesses with an intent to intimidate, threaten, coerce, and/or fabricate statements.

## COUNT IV
## State Law Claim

119.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

120.   Defendant Nordo's knowing, intentional and/or reckless false statements were the direct and proximate cause of the prosecution of Plaintiff for the murder of Mr. Sharpe. Defendant Nordo caused the prosecution of Plaintiff without probable cause and they acted with malice or specific intent to injure.

121.   Plaintiff suffered a deprivation of liberty as a result of the prosecution. Plaintiff's arrest for the murder of Mr. Sharpe was vacated and the charges were withdrawn.

**WHEREFORE,** Plaintiff, Marvin Hill, seeks damages against Defendants, jointly and severally, in an amount in excess of $75,000, including costs of suit, interest, attorney's fees, punitive/exemplary damages and such other relief as this Honorable Court deems appropriate.

VSCPLAW   VAN NAARDEN · SPIZER
          CHASE · PINTO

*Joshua Van Naarden*
JOSHUA VAN NAARDEN, ESQUIRE
ANWAR ABDUR-RAHAN, ESQUIRE
JULIA RONNEBAUM, ESQUIRE
Identification No. 86740/330191/326785
2001 Market Street, Suite 3700
Philadelphia, PA 19103
TEL: (215) 960-0000
FAX: (215) 960-0384

*Attorneys for Plaintiff*

Dated: March 15, 2023